IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JUSTIN E. PARTEE                                                    PLAINTIFF

v.                              CIVIL NO. 08-3030

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                    DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a

decision of the Commissioner of the Social Security Administration (Commissioner) denying

his claims for child's supplemental security income (SSI) and adult SSI benefits under the

provisions of Title XVI of the Social Security Act (Act).  In this judicial review, the court must

determine whether there is substantial evidence in the administrative record to support the

Commissioner's decision.  *See* 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed his current applications for both child and adult SSI benefits

on February 25, 2005, alleging disability since March 1, 2001, due to a broken leg and pain

associated with his leg.  (Tr. 50-51, 74, 301303).  An administrative hearing was held on June

27, 2007, at which plaintiff appeared with counsel and testified. (Tr. 320-338). A witness also

testified at the hearing. (Tr. 320, 335).

By written decision dated January 24, 2008, the ALJ found that during the relevant time

period plaintiff had an impairment or combination of impairments that were severe. (Tr.14).

Specifically, the ALJ found plaintiff has the following severe impairments: borderline

intellectual functioning and status post fracture dislocation of the left ankle with open reduction internal fixation (ORIF). However, after reviewing all of the evidence presented, he determined that plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 15). The ALJ found plaintiff retained the residual functional capacity (RFC) to occasionally lift and/or carry ten pounds, frequently less than ten pounds; to sit for six hours and stand and/or walk for two hours; and to occasionally balance, climb, crawl, stoop, kneel and crouch. (Tr. 15). The ALJ found plaintiff cannot operate foot controls with the left leg and foot and cannot be required to operate a moving vehicle. From a mental standpoint, the ALJ found the following: plaintiff has mild limitations in the ability to understand, remember and carry out simple instructions and interact appropriately with supervisors, the public and co-workers; plaintiff has moderate limitations in the ability to make judgments on simple work-related decisions and the ability to appropriately respond to usual work situations and routine work changes; plaintiff has marked limitations in the ability to understand and remember complex instructions; and plaintiff has extreme limitations in the ability to carry out complex instructions and make judgments on complex work-related decisions. (Tr. 15). With the help of a vocational expert, the ALJ determined plaintiff could perform other work as a small production machine operator, a small product assembler, and a food order clerk. (Tr. 21, 157, 159-162).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which, after reviewing the additional evidence, denied that request on April 11, 2008. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Doc. 10, 11).

II.   **Evidence Presented:**

At the administrative hearing held before the ALJ on June 27, 2007, plaintiff testified he was twenty-two years of age.  (Tr. 322, 325).  Plaintiff testified he obtained an eleventh grade education but failed the test required to get his GED.  (Tr. 326).  The record shows plaintiff has performed some work.  At the hearing, plaintiff testified he does some part-time work helping to install septic tanks for his grandfather.  (Tr. 331).  Plaintiff testified in 2006 he worked for a company that cleaned port-a-potties and that he mainly drove the truck but also cleaned out the facilities.  (Tr. 333).  Plaintiff testified he was laid off from this job for the winter and did not return the next season.

The pertinent medical evidence in this case reflects the following.  Plaintiff was admitted into Baxter Regional Medical Center on March 4, 2002, for surgical treatment of a fracture dislocation of the left ankle.  (Tr. 184).  Plaintiff underwent an open reduction and internal fixation performed by Dr. James R. Friend.  (Tr. 180).  Plaintiff was discharged on March 9, 2002.  (Tr. 180).

Progress notes dated March 14, 2002, report plaintiff presents for follow-up on a bimalleolar ankle fracture. (Tr. 228).  Dr. Thomas E. Knox notes plaintiff's wound still shows some slight drainage. Dr. Knox put plaintiff in a new rigid dressing and instructed plaintiff to return in one week.  Dr. Knox opines plaintiff's humongous size is going to be an issue with the healing of his wound.

On March 21, 2002, plaintiff complained of left leg pain.  (Tr. 179, 228). Dr. Knox notes plaintiff has developed erythema, swelling and weeping of the wound.  Plaintiff was admitted for elevation wound care with intravenous antibiotics.  (Tr. 178). Dr. Knox discharged plaintiff

-3-

home to continue with elevation.  Dr. Knox also indicated plaintiff would undergo physical therapy.

Plaintiff was referred to physical therapy and on March 29, 2002, underwent an evaluation.  (Tr. 227, 208).  Mr. H. Ellis Hall, PT, notes plaintiff was referred by Dr. Knox with a diagnosis of cellulites left ankle, status post ORIF.  Mr. Hall notes plaintiff is morbidly obese weighing approximately 385 pounds.  Since the ORIF, plaintiff developed a rather large open wound on the medial aspect of his left ankle.  Plaintiff reports his pain a three on a ten point scale.  Mr. Hall opines plaintiff appears to be suffering from a partial thickness wound due to surgery.  Mr. Hall opines plaintiff would benefit from physical therapy to help debride the wound of necrotic tissue and keep a clean wound environment.  The plan was for plaintiff to be seen daily for whirlpool and wound care. (Tr. 209).

Progress notes dated April 1, 2002, report plaintiff's wound is cleaning nicely with a healthy granulation base.  (Tr. 227).  Dr. Knox opines plaintiff should be ready for skin graft in the next week or so.

Physical therapy notes dated April 2, 2002, report plaintiff has been seen for five visits. (Tr. 207).  Mr. Hall notes he has removed approximately 95% of the necrotic tissue on plaintiff's wound bed.  Mr. Hall notes there is approximately 10-20% granulation tissue forming around the edges.  Mr. Hall notes a slight undermining occurring on the distal, posterior aspect of the wound. Mr. Hall opines once the wound bed was clean and void of necrotic tissue plaintiff may be a good candidate for a skin graft to speed the healing time.

Progress notes dated April 8, 2002, report plaintiff's ankle wound is cleaning nicely.  (Tr. 227).  Dr. Knox indicates he will be contacting a general surgeon to see about a skin graft.

-4-

Physical therapy notes dated April 8, 2002, report plaintiff has been seen for ten visits. (Tr. 206). Mr. Hall notes plaintiff's wound has shown considerable progress over the course of therapy. Mr. Hall notes plaintiff has approximately 75% granulation tissue in the wound bed and it appears free of necrotic tissue. Mr Hall notes plaintiff has three small areas of tunneling which are being packed with Nu-gauze. Mr. Hall describes the wound treatment and noted plaintiff will continue to be seen every other day until the wound is healed.

Progress notes dated April 18, 2002, report plaintiff presents for a follow-up on his open wound of the left ankle. (Tr. 227). Dr. Knox notes plaintiff's swelling is down and he has a healthy granulation base. Dr. Knox opines Dr. Stahl will be able to skin graft in the near future. Plaintiff was to continue with physical therapy and to return in two weeks.

Physical therapy notes dated April 19, 2002, report plaintiff's wound is showing excellent improvement. (Tr. 177). Mr. Hall notes he did a moderate amount of debridement of some yellow adipose type tissue.

Physical therapy notes dated April 25, 2002, report plaintiff's wound shows no necrotic tissue present and is clean and free of any visible signs of infection. (Tr. 205). Mr. Paul Henry, PT, notes there are good granulation tissue buds present and the wound is showing gradual fill-in. Mr. Henry notes he is continuing with the wet-to-dry dressing change as ordered per Dr. Stahl. Mr. Henry notes he expects plaintiff's wound to heal but due to the depth of the wound it will take some time.

Progress notes dated May 2, 2002, report plaintiff presents for follow-up on his dehiscene of the medial malleolar wound. (Tr. 226). Plaintiff reports numbness of the plantar surface of

AO72A
(Rev. 8/82)

the foot consistent with severe posterior tibial nerve injury/contusion.  Dr. Knox notes plaintiff's wound looks good.  Dr. Knox opines plaintiff is getting close to being ready for a skin graft.

Physical therapy notes dated May 3, 2002, report plaintiff's wound continues to show excellent progress.  (Tr. 204).  Mr. Hall notes the wound edges are filling in and the wound is steadily growing granulation tissue.  Mr. Hall notes he has continued with the wet-to-dry dressing as ordered by Dr. Stahl. Mr. Hall opines plaintiff's wound would eventually heal and may not even need a skin graft.

In a letter dated May 6, 2002, Dr. Ray E. Stahl notes he has been following plaintiff for a while because of his left ankle injury.  (Tr. 225).   Dr. Stahl notes it is taking longer to get this wound readied because of the depth of the wound and the lack of adequate granulation tissue. Dr. Stahl notes plaintiff's wound looks much better than it has but still has a long way to go.  Dr. Stahl opines it was doubtful that a skin graft would work due to plaintiff's size and plaintiff's ability to adequately care for it. Dr. Stahl states he will continue to monitor plaintiff.

Physical therapy notes dated May 13, 2002, report plaintiff continues to be seen every day for wound care to his left medial ankle region.  (Tr. 203).  Mr. Hall notes the wound continues to approximate on both wound edges and the epithelia tissue is rapidly re-growing. Mr. Hall notes there are still two small indentations that are slowly starting to fill in. Mr. Hall notes plaintiff still has a moderate amount of drainage but it is concealed in the dressing.  Mr. Hall recommends changing to every other day dressing changes.

Progress notes dated May 17, 2002, report plaintiff presents for follow-up on the left ankle fracture with wound dehiscene of the medial side from severe hematoma and skin injury. (Tr. 226).  Dr. Knox opines a skin graft might be helpful.  Dr. Knox notes plantar sensation to

-6-

the foot is about the same as it has been.  X-rays of the left ankle show the unstable bimalleolar fracture appears to be healing.  Dr. Knox indicates plaintiff may go with guarded weightbearing.

Physical therapy notes dated May 22, 2002, report plaintiff continues to be seen every other day for wet-to-dry dressing changes to his left medial ankle. (Tr. 202).  Mr. Hall notes the wound continues to show excellent progress and has full granulation in the wound bed.  Mr. Hall notes the wound continues to fill-in and the wound edges are approximating.  Mr. Hall notes the wound still has a moderate amount of yellow, serous drainage.  Mr. Hall opines the wound will heal on its own.

Physical therapy notes dated May 28, 2002, report plaintiff has increased drainage from his wound. (Tr. 201).  Mr. Hall notes the wound was covered with a dark yellow adherent slough like material and the wound edges were extremely macerated.  Mr. Hall notes plaintiff has not shown for his last two schedule appointments and that plaintiff was told by nurses at Dr. Stahl's office that he could perform the dressing changes at home over the course of the last couple of days. Mr. Hall notes his concerns of the wound because when plaintiff was last seen the wound looked extremely well.  Plaintiff was instructed not to perform any more dressing changes at home. Mr. Hall notes the areas around the wound and plaintiff's entire ankle revealed increased erythema.

Progress notes dated June 7, 2002, report plaintiff still has a significant open granulating area of the distal ankle. (Tr. 226).  Dr. Knox notes Dr. Stahl feels it does not need a graft so plaintiff will continue with conservative management.  Dr. Knox notes plaintiff's foot still has decreased sensation on the plantar surface.

-7-

Physical therapy notes dates June 14, 2002, report plaintiff has been a no-show on three of his last four visits and has cancelled one visit. (Tr. 200).  Mr. Henry notes plaintiff has no real viable reason for missing the appointments.  Observation of the wound bed shows it has dried out somewhat.  Mr. Henry notes there is a yellow slough present but the wound depth is minimal at best.  Mr. Henry encouraged plaintiff to be more compliant with is visits.  Mr. Henry opines plaintiff's wound should be healed within the next two weeks.

Physical therapy notes dated June 27, 2002, report plaintiff continues to be seen for wound care on the medial aspect of the left ankle.  (Tr. 199).  Mr. Rowdy Kelly, PT, notes plaintiff's wound shows approximately 20% yellow slough to the wound bed and the rest of the wound has granulation tissue present. Mr. Kelly notes significant improvement from previous visits and that the depth of the wound has significantly filled-in in comparison to pictures taken the previous month.

Physical therapy notes dated July 10, 2002, report plaintiff continues to be seen every other day for dressing changes and selective debridement using forceps.  (Tr. 198).  Mr. Hall notes plaintiff presented today with a moderate amount of macerated tissue around the wound bed due to excessive sweating. Mr. Hall notes it is difficult to assess whether the drainage around this area is from excessive sweat or from the wound.  Plaintiff's wound was cleaned and he was given instructions on changing the dressing the next day. It was further recommended that plaintiff purchase sandals to help decrease the sweating.

Physical therapy notes dated July 17, 2002, report plaintiff has epithelialization over the entire wound bed and only a minimal amount of yellowish brown drainage. (Tr. 196).  Mr. Hall notes he was able to debride some slight sloughing skin around the edges of the wound and a

-8-

small bit in the wound bed itself. Mr. Hall notes over the last several days the wound appeared extremely macerated and that he strongly encouraged plaintiff to change his dressing on a daily basis. Plaintiff was instructed to remove his walking boot and to begin use of normal tennis shoes and a sock to promote aeration to the wound.

Physical therapy notes dated August 6, 2002, report plaintiff continues to be seen once a week for dressing changes. (Tr. 195). Mr. Hall notes the wound edges do seem to still be approximating and plaintiff continues to have a minimal amount of yellow serous drainage coming from the wound bed. Mr. Hall notes there is a slight odor to the drainage but he suspects this could partially be due to poor hygiene. Mr. Hall notes overall the wound is doing well. Mr. Hall notes plaintiff will continue to be seen once a week to ensure the wound bed closes properly.

Physical therapy notes dated August 14, 2002, report plaintiff's wound is continuing to approximate and has a minimal amount of serous drainage. (Tr. 193). Mr. Hall notes plaintiff has one little dark area on the superior border of the wound which appears to be a blood blister. These notes indicate overall the wound bed still continues to granulate and close.

Physical therapy notes dated August 20, 2002, report plaintiff continues to dress the wound at home using a large band-aid. (Tr. 194). Mr. Hall notes that wound still has a slight area of maceration around the wound which he feels is due to increased moisture from perspiration. Mr. Hall notes overall the wound continues to approximate.

Physical therapy notes dated August 30, 2002, report plaintiff's wound continues to decrease in size. (Tr. 192). Mr. Hall notes the healing is still extremely slow. Mr. Hall notes selective debridement of a small area was done and that the wound continues to drain a minimal

-9-

amount of yellow serous fluid.  Mr. Hall notes plaintiff's left leg was wrapped with an Ace bandage to help control the edema in his left ankle to see if that helped with the healing process. Plaintiff was also instructed to change his bandage on a more routine basis to help promote a drier environment.

Physical therapy notes dated September 6, 2002, report plaintiff presents with a minimal to moderate amount of yellow serous drainage. (Tr. 191).  Mr. Hall notes plaintiff's wound has not significantly changed in size since the last note.  Mr. Hall notes the wound bed is still severely macerated due to the drainage from the wound and there is a slight film of yellow adherent slough.  Mr. Hall notes plaintiff's wound appears to be an open area of drainage that does not appear to be willing to close. Mr. Hall notes plaintiff has not been following instructions given to him so he recommends plaintiff be seen three times a week for dressing changes.

Physical therapy notes dated September 12, 2002, report plaintiff's wound appears to have less drainage and that it has started to close. (Tr. 190).  Mr. Hall notes he has been more aggressive with compression on plaintiff's leg and this seems to be helping. Mr. Hall notes plaintiff has had a significant reduction of edema.

Physical therapy notes dated September 20, 2002, report there is a significant reduction in the size of plaintiff's wound.  (Tr. 189).  Mr. Hall notes plaintiff has minimal drainage from the wound and the edema in his lower extremity has significantly reduced.  Mr. Hall opines plaintiff's wound would close in the next one to two visits.

Progress notes dated October 14, 2002, report plaintiff's open medial ankle wound and lateral malleolus fracture have healed. (Tr. 226).  Dr. Knox opines plaintiff will probably need surgery for his toes.

Physical therapy notes dated October 4, 2002, report plaintiff has had final closure in the wound bed. (Tr. 186). Mr. Hall notes there is no drainage and the wound appears completely healed. Mr. Hall notes plaintiff has full epithelialization. Plaintiff was instructed to continue to use a Band-Aid over the wound and to protect it from further shear forces while wearing a sock. Mr. Hall notes plaintiff did have edema in his lower extremity and was given two Ace bandages to place over his foot, ankle and calf region to help reduce the edema. Mr. Hall opines plaintiff was no longer in need of physical therapy and discharged plaintiff.

Progress notes dated January 20, 2003, report plaintiff weighs 350+ pounds. (Tr. 211, 290). The notes indicate plaintiff's school wants a note so that he can get special education.

Progress notes dated July 24, 2003, report plaintiff's complaints of bilateral pain on the lateral sides of his feet. (Tr. 210, 289). Treatment notes reveal plaintiff has a sixth toe on each foot.

Progress notes dated August 14, 2003, report plaintiff presents because of a supernumerary toe of the right foot. (Tr. 224). Dr. Knox notes this is really starting to bother plaintiff. Dr. Knox also notes plaintiff has some swelling of his left ankle. Dr. Knox suggested excision of the toe. Dr. Knox also noted at some point plaintiff may undergo hardware removal from his ankle.

On August 28, 2003, Dr. Paul S. Shurnas notes plaintiff has healed from an open reduction internal fixation performed in March of 2002, but the syndesmotic screw is now backing out and irritating the tendons and causing some pain. (Tr. 174-175, 222). Additionally, Dr. Shurnas notes plaintiff has syndactyly, polydactyly with extra small toe on both feet. Dr. Shurnas notes plaintiff's right foot is painful and causing difficulty with shoe wear. Plaintiff also

-11-

has problems with ingrown nails being painful. Plaintiff reports he was not taking any medication. Plaintiff underwent a Bilhaut-Cloquet procedure of right sixth toe, a fifth metatarsal bunioneette repair right foot, hardware removal, one deep screw left ankle and bilateral nail edge avulsions of great toes on August 29, 2003. (Tr. 169-171).

Progress notes dated September 3, 2003, report plaintiff's wound is clean, dry and intact. (Tr. 220). Dr. Shurnas notes there is some mild swelling.

Progress notes dated September 9, 2003, report plaintiff's dad had him soaking his foot in well water and Epsom salts because it was smelly. (Tr. 220). Dr. Shurnas notes plaintiff has developed redness and swelling and that he has some wound drainage. Dr. Shurnas notes the great toenail avulsion is even irritated after soaking it in well water. Dr. Shurnas gave plaintiff a shot of Invance and Keflex to be taken for one week. Dr. Shurnas instructed plaintiff to take the rest of the day off from school and to elevate his foot way above his heart. Plaintiff was instructed not to soak his foot in well water or to remove his bandages.

Progress notes dated September 15, 2003, report plaintiff's wound is clean, dry and intact. (Tr. 220). Dr. Shurnas removed sutures. Dr. Shurnas noted a little bit of granulation tissue on a spot of superficial skin loss but given the procedure Dr. Shurnas opines the wound looks excellent. Plaintiff was to return in seven to ten days.

Progress notes dated September 24, 2003, report plaintiff's wound is much improved. (Tr. 219). Dr. Shurnas notes swelling is improved. Plaintiff reports having some clicking in his left ankle region. Upon examination, Dr. Shurnas did not feel any obvious area of click or crepitus. Plaintiff did complain of tenderness around the joint. Dr. Shurnas notes it was okay for plaintiff to use band-aids and that he could weight bear as tolerated.

-12-

Progress notes dated October 13, 2003, report plaintiff still has a little bit of drainage on the band-aid. (Tr. 219). Dr. Shurnas notes alignment is excellent with regard to plaintiff's right foot. Dr. Shurnas notes the left ankle is still fairly swollen and plaintiff still feels some impingement medially where the open wound was. Overall plaintiff's symptoms are better and his swelling is coming along nicely. Dr. Shurnas notes x-rays certainly show calcification in the ligament at the left ankle medially. Plaintiff was instructed to use T.E.D. hose for swelling control and to continue to use a band-aid for the right foot superficial excoriation.

Progress notes dated November 12, 2003, report plaintiff's right foot looks excellent. (Tr. 218). Dr. Shurnas notes plaintiff's left ankle is painful and swollen in the joint primarily. X-rays show enstage arthritis of the left ankle. Plaintiff was instructed to use an Arizona brace with a molded AFO. Dr. Shurnas notes he might have to do an arthrodesis of plaintiff's ankle even though plaintiff is young.

Progress notes dated January 7, 2004, report plaintiff's foot is doing fine. (Tr. 218). Plaintiff reports his left ankle is hurting worse and he lost the prescription for the brace. Upon examination, Dr. Shurnas notes plaintiff is in no acute distress. Plaintiff's hearing is intact to whispered voice. Plaintiff's recent and remote memory were intact and his mood and affect was appropriate. Dr. Shurnas notes plaintiff's left ankle has an effusion and there is eschar where some of the skin was rubbed with his show. Dr. Shurnas gave plaintiff another prescription for the Arizona brace.

Progress notes dated February 24, 2004, report plaintiff has an abrasion over his wound medially as this is where the brace is hitting him. (Tr. 218). Dr. Shurnas notes some superficial ulceration and blistering. Dr. Shurnas notes he cleaned the wound really well and added some

-13-

foam to the brace. Plaintiff was given some Keflex for prophylaxis.  Plaintiff was instructed to do soapy soaks and hydrogen peroxide.

Progress notes dated March 9, 2004, report plaintiff has a lot of tenderness over the fibular place and also pin in the ankle joint. (Tr. 217).  Dr. Shurnas notes the pain is more with dorsiflexion. Upon examination, Dr. Shurnas notes tenderness with maximal dorsiflexion which initiates the pain. He notes plaintiff has reasonably well preserved motion of the ankle joint.  Dr. Shurnas notes plaintiff has five degrees of dorsiflexion, twenty degrees plantar flexion thirty degrees at most. Dr. Shurnas opines plaintiff joint is stable and that his medial ulcer has healed nicely.  After reviewing x-rays, Dr. Shurnas recommended hardware removal, arthroscopic debridement of the ankle and excision of the tibial osteophyte.

On March 16, 2004, Dr. Shurnas notes plaintiff has posttraumatic arthritis of his left ankle after an open fracture dislocation treated by open reduction internal fixation.  (Tr. 165, 172-173, 281-284).  Due to failed nonoperative treatment, plaintiff underwent an arthroscopic debridement, ankle joint, with excision of distal tibial spur and hardware removal.

Progress notes dated March 24, 2004, report plaintiff's wound is clean, dry and intact. (Tr. 217).  Dr. Shurnas notes mild swelling and range of motion without pain.  Plaintiff was placed in a Cam walking boot and to initiate weightbearing.

Progress notes dated April 1, 2004, report plaintiff has quite a bit of swelling.  (Tr. 216). Dr. Shurnas gave plaintiff Keflex and instructed him to stop using the walking boot.

Progress notes date dated April 8, 2004, report plaintiff's swelling is much less.  (Tr. 216).  Dr. Shurnas notes plaintiff is to continue compression wrap, cam boot and to transition

-14-

to his ankle brace. Dr. Shurnas opines plaintiff ultimately would require arthrodesis.  Plaintiff's pain was noted to be better than it was before.

Progress notes dated May 6, 2004, report plaintiff's swelling has come out nicely but plaintiff has developed dermatitis from the wrap.  (Tr. 216).  Dr. Shurnas notes plaintiff still has a wound that he wanted plaintiff to clean daily and protect with a band-aid.  Plaintiff was to continue using his brace and the compression hose for swelling control. Hydrocortisone was to be used on his wounds.

Progress notes dated May 24, 2004, report plaintiff's wounds have healed.  (Tr. 216). Dr. Shurnas notes just a little bit of eschar is remaining and his medial ulcer has healed.

Progress notes dated June 16, 2004, report plaintiff is doing better now.  (Tr. 216).  Dr. Shurnas notes plaintiff's wounds look good and plaintiff has much less swelling. Dr. Shurnas notes plaintiff still needs to wear elastic stocking for support and that plaintiff finally has one. Dr. Shurnas opines it was okay for plaintiff to progress his activities.  Plaintiff was also working on weight loss.

On August 18, 2004, plaintiff underwent a orthopedic consultative examination performed by Dr. Charles D. Varela.  (Tr. 230-232).  Dr. Varela notes records of plaintiff's initial treatment and postoperative period were not available for review.  Dr. Varela notes the only ongoing problem plaintiff has from an orthopedic standpoint is his left ankle condition.  Plaintiff reports his left ankle bothers him in an aching manner at a level eight on a ten point scale. Plaintiff reports his pain lessens by when he gets off his leg.  Plaintiff reports his ankle bothers him when he stands, walks, lifts, carries, climbs and pulls.  Plaintiff reports he takes oxycodone for pain relief which does help quite a bit but has a sedative effect.  Plaintiff reports he has

-15-

moderate difficulty dressing himself and picking up clothes and severe difficulty vacuuming, sweeping, carrying groceries, climbing stairs or ladders or performing gardening work. Plaintiff reports standing and walking are tolerated for less than thirty minutes at a time. Plaintiff reports he can lift up to thirty pounds repeatedly and can carry that up to fifty feet.

Upon examination, Dr. Varela notes plaintiff is a well-developed, well-nourished morbidly obese young male who was very cooperative throughout the exam. Cervical spine and upper extremity exams all were normal as was plaintiff's back and his lower extremity with the exception of the left ankle. Dr. Varela notes no drainage from the medial incision but there were two lateral punctate sinuses draining purulent material. Plaintiff's joint was not warm or red. Plaintiff's foot and ankle were moderately swollen. Dr. Varela notes plaintiff has painful and limited subtalar motion. Plaintiff's ankle was ankylosed essentially in a neutral position although plaintiff had flexion contractures at the mid plantar and distal foot with associated hammertoes of the great, second, third and fourth toes. X-rays show severe degenerative changes of the ankle joint with moderate degenerative changes of the subtalar joint. Dr. Valera notes no evidence of osteomyelitis. Dr. Valera diagnosed plaintiff with ankylosis of the left ankle joint. Dr. Valera opined plaintiff could not perform many manual labor-type occupations, particularly those requiring standing, walking, climbing, squatting, lifting and carrying activities. Dr. Valera opined plaintiff should be able to perform sedentary occupations although due to the fact plaintiff takes oxycodone for pain relief, driving occupations are not recommended. Dr. Valera notes there are no indications for impairment of the upper extremities or back.

On September 30, 2004, Dr. Robert M. Redd, a non-examining, consultative physician, completed an RFC assessment. (Tr. 234-241). After reviewing plaintiff's medical records, he

-16-

concluded that plaintiff could lift and/or carry ten pounds occasionally and less than ten pounds frequently; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and push and/or pull (including operation of hand and/or foot controls) limited in the lower extremities. (Tr. 235). Dr. Redd opined plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl. (Tr. 236). Dr. Redd opined plaintiff had no manipulative, visual, communicative or environmental limitations.

On April 28, 2005, Dr. Robert M. Redd, a non-examining, consultative physician, completed an RFC assessment. (Tr. 244-251). After reviewing plaintiff's medical records, he concluded that plaintiff could lift and/or carry ten pounds occasionally and less than ten pounds frequently; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and push and/or pull (including operation of hand and/or foot controls) limited in the lower extremities. (Tr. 245). Dr. Redd opined plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl. (Tr. 246). Dr. Redd opined plaintiff had no manipulative, visual, communicative or environmental limitations. On August 11, 2005, Dr. Robert Beard affirmed Dr. Redd's April 28, 2005, assessment. (Tr. 251).

On April 27, 2007, plaintiff was admitted into Baxter Regional Medical Center after complaining of right groin and stomach pain for two days. (Tr. 267). Plaintiff reported he was not taking any medications. Plaintiff reported he bush hogs for his grandfather. Plaintiff reported occasional ankle pain from his surgical site. (Tr. 267). Dr. Mark Williams' impression states

-17-

appendectomy or gallbladder. (Tr. 268). Plaintiff underwent an appendectomy and then was discharged on May 3, 2007. (Tr. 266, 272).

On July 2, 2007, plaintiff underwent a neuropsychological evaluation performed by Dr. Vann Arthur Smith. (Tr. 255-258). Dr. Smith notes a clinical history was obtained from plaintiff and that plaintiff's medical records are being requested for review. Dr. Smith notes plaintiff presents with a history of progressively worsening neurocognitive and emotive symptoms including: impaired recall memory, word finding difficulty, affective lability, impaired attention to sequential detail, sleep pattern disturbance and dysexecutivism. Upon examination, Dr. Smith notes plaintiff was oriented to gross time, generalized place and person. Plaintiff's affect was muted and shallow and his mood was mildly dysthymic. Plaintiff's judgment and insight were somewhat restricted. Eye contact was appropriately maintained. Plaintiff's memory was impaired and his intelligence was estimated to lie within the borderline range. After reviewing plaintiff's test scores, Dr. Smith opines plaintiff has impaired brain function. Dr. Smith opines plaintiff is unable to carry out routine daily activities in a consistent manner which rendered plaintiff disabled.

Dr. Smith also completed a mental RFC questionnaire opining plaintiff's current global assessment of functioning (GAF) score to be 30 to 35. (Tr. 259). Dr. Smith notes plaintiff's signs and symptoms are as follows: psychological or behavioral abnormalities, associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities, easy distractibility and sleep disturbance. (Tr. 260). With the exception of being limited but satisfactory in the area of adhering to basic standards of neatness and cleanliness, Dr. Smith opines plaintiff is seriously

-18-

limited but not precluded or unable to meet competitive standards in all areas of functioning. (Tr. 261-262). Dr. Smith further opines plaintiff would miss more than four days per month due to his impairments. (Tr. 262).

On October 10, 2007, plaintiff underwent a consultative intellectual functioning and adaptive functioning evaluation performed by Nancy A. Bunting, PH.D. (Tr. 294-297). Dr. Bunting notes plaintiff reports no mental/emotional problems that interfere with his working. Plaintiff has no history of suicide attempts, suicidal ideation or homicidal ideation. Plaintiff reports his appetite is "okay" and his weight is stable. Plaintiff reports his sleep is good and he typically gets nine hours of sleep at night. Plaintiff reports he takes a forty minute nap daily. Plaintiff reports no history of nightmares or mood cycles. Plaintiff reports his energy is poor and his concentration varies. Plaintiff reports he has friends but is not involved in church or in any other groups. Plaintiff reports he gets out of the house daily. Dr. Bunting notes plaintiff is not taking any medications. Plaintiff reports he can do all self-care and does not need any reminders. Plaintiff does not smoke cigarettes but he does chew ½ can of tobacco daily. Dr. Bunting notes plaintiff was placed in special education classes for reading and math beginning in grade school. Dr. Bunting notes plaintiff works one to two days a week for his grandfather doing farm work. Dr. Bunting notes plaintiff's eye contact was fair and his thoughts were logical and goal corrected. Plaintiff was alert, attentive and cooperative. Dr. Bunting opines plaintiff appeared to put forth a consistent level of effort on the tests and his persistence was good. Plaintiff's pace was slow. Dr. Bunting notes plaintiff's concentration was adequate for the testing situation. Dr. Bunting reports plaintiff's Full Scale IQ was 79 which fell into the borderline intellectual range. Dr. Bunting opined plaintiff has a GAF score of 55-65.

-19-

Regarding adaptive functioning, Dr. Bunting notes plaintiff drove to the appointment. Dr. Bunting notes plaintiff reports he can shop and make change; that he does household chores like doing laundry regularly and that he helps out with reminders with sweeping and vacuuming. Plaintiff also reported he did not wash dishes or clean. Plaintiff reported he spends his time seeing friends, watching television and shooting his gun. Dr. Bunting opines plaintiff is functioning in the borderline range of intelligence and can do routine structured work like farm work. Dr. Bunting notes plaintiff was able to maintain persistence and is presently working part-time. Dr. Bunting notes plaintiff can do this work for at least short periods of time. When asked if plaintiff could compete work within acceptable time frame, Dr. Bunting opines plaintiff's borderline concentration and poor energy level would make this difficult.

Dr. Bunting completed a medical source statement on October 28, 2007. (Tr. 298-300). Dr. Bunting opines plaintiff has mild limitations with understanding and remembering simple instructions and carrying out simple instructions; moderate limitations with making judgments on simple work-related decisions; marked limitations with understanding and remembering complex instructions; and extreme limitations with carrying out complex instructions and making judgments on complex work-related decisions. (Tr. 298). Dr. Bunting opines plaintiff has mild limitation interacting appropriately with the public, interacting appropriately with supervisors and interacting appropriately with co-workers; and moderate limitations with responding appropriately to usual work situations and to changes in a routine or work setting. (Tr. 299). Dr. Bunting opines plaintiff could not manage his own funds. (Tr. 300).

-20-

III.   **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, P.L. 104-193, revised the standards for determining childhood disability. Under the "interim" revised standards, a child is considered disabled if he has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to last for a continuous period of at least twelve months. *See* 42 U.S.C. § 1382c(a)(3)(c)(I). Effective January 2, 2001, the Commissioner promulgated "final" revised rules in response to public comments regarding the implementation of the revised rules . *See* Childhood Disability Provisions, 65 Fed. Reg. 54747 (September 11,2000)(to be codified at 20 C.F.R. Pts. 404, 416). Under these "final" rules there is now a single method, rather than four

-21-

separate methods, for evaluating functional equivalence based only on six domains of functioning. 20 C.F.R. § 416.926a(b)

The regulations implementing the revised standards prescribe a three-step process for making the disability determination.  First, the ALJ must determine whether the child has engaged in substantial gainful activity.  *See* 20 C.F.R. 416.924(b).  Second, the ALJ must determine whether the child has a severe impairment or combination of impairments.  *See* 20 C.F.R. 416.924(c).  Third, the ALJ must determine whether the severe impairment(s) meets, medically equals, or functionally equals a listed impairment.  *See* 20 C.F.R. § 416.924(d).

The Regulations provide that redetermination of an individual's right to SSI disability benefits is required when the individual, who become eligible for SSI disability benefits as a child, turns eighteen years of age.  20 C.F.R. § 416.987.  When the individual's eligibility for disability benefits is redetermined at age eighteen, the rules applied are those applicable to adults who file new disability applications, which are set forth in 20 C.F.R. § 416.920.

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c)).  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

-22-

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  *See* 20 C.F.R. § 416.920.  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity.  *See McCoy v. Schwieker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § 416.920.

**IV.**   **Discussion:**

Plaintiff contends that the ALJ erred in concluding that the plaintiff was not disabled since March 1, 2001, his alleged onset date through the date of the January 24, 2008, determination.  Defendant contends the record supports the ALJ determination that plaintiff was not disabled through the date of the ALJ decision.

**A.**   **Plaintiff's alleged depression:**

After reviewing the record we find substantial evidence to support the ALJ"s determination that plaintiff's alleged depression is not a severe impairment.  First, plaintiff did not allege any disabling mental impairment when he applied for benefits. *See Smith v. Shalala*, 987 F.2d 1371, 1375 (8th Cir. 1993) (substantial evidence supported ALJ's discounting of psychiatrist's opinion that claimant suffered from disabling mental impairment where, inter alia, claimant did not allege mental impairment in disability application); *See Dunahoo v. Apfel*, 241

-23-

F.3d 1033, 1039 (8ᵗʰ Cir. 2001) (failure to allege disabling mental impairment in application is significant, even if evidence of depression is later developed).  Second, the record reveals plaintiff has never sought treatment for a mental impairment nor has he taken medication for a mental impairment.  *See Jones v. Callahan*, 122 F.3d 1148, 1153 (8th Cir. 1997) (ALJ properly concluded claimant did not have a severe mental impairment, where claimant was not undergoing regular mental-health treatment or regularly taking psychiatric medications, and where his daily activities were not restricted from emotional causes).  Finally, plaintiff was not diagnosed with depression by any mental health professional.  While Dr. Smith notes plaintiff's mood was mildly dysthymic, he did not diagnose plaintiff with depression in July of 2007.  In October of 2007, plaintiff reported no mental/emotional problems interfered with his working.  Plaintiff also reported his appetite was "okay" and his sleep was good.  Plaintiff denied mood cycles.  Dr. Bunting also did not diagnose plaintiff with depression.

The court acknowledges plaintiff testified he was depressed at the hearing; however neither Dr. Smith in July of 2007, nor Dr. Bunting in October of 2007, found plaintiff to be depressed.  Furthermore, the record reflects plaintiff reported he was able to hang out with friends, play pool, and ride around.  (Tr. 96).  After reviewing the entire evidence of record, we find substantial evidence to support the ALJ's determination that plaintiff's alleged depression was not a severe impairment.

**B.**  **Subjective Complaints and Credibility Analysis:**

In disability determinations, credibility assessments are the province of the ALJ.  *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992).  This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the

-24-

decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id.* As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart,* 314 F.3d 964, 966 (8th Cir. 2003). We believe the ALJ adequately evaluated the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), and conclude there is substantial evidence supporting the ALJ's determination that plaintiff's complaints were not fully credible.

The record reflects plaintiff sustained an open fracture dislocation of the left ankle on March 4, 2002, which was repaired with an open reduction internal fixation. Plaintiff was referred to physical therapy and on March 29, 2002, Mr. Hall notes plaintiff is a morbidly obese male with a rather large open wound on the medial aspect of the left ankle. The record reflects plaintiff underwent physical therapy up through October 4, 2002. At that time, plaintiff was noted to have a closed wound and reduced edema. In August of 2003, plaintiff underwent the removal of an extra toe on his right foot. At that time plaintiff also had a screw removed from his left ankle. In September of 2003, plaintiff reported some clicking in his left ankle; however, upon examination Dr. Shurnas found no obvious area of click or crepitus. Plaintiff was instructed to use support hose for his ankle in October of 2003, and to use a brace in November of 2003. The records reflect in January of 2004, plaintiff reported he had lost the prescription for the brace and that he did not have the support hose until June of 2004. *Brown v. Barnhart*,

-25-

390 F.3d 535, 540-541 (8th Cir. 2004)(citations omitted)("Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.").

Plaintiff underwent hardware removal in his left ankle in March of 2004. Following this procedure, plaintiff's ankle was noted to have mild swelling and range of motion without pain. The medical record reflects plaintiff last sought treatment for his left ankle in June of 2004. Furthermore, when seeking treatment for other medical problems in April of 2007, plaintiff reported he experienced occasional ankle pain from his surgical site. While plaintiff argues the ALJ erred in not addressing plaintiff's use of oxycodone which results in him feeling sedated, the record clearly establishes plaintiff denied taking prescribed medication in March 2004, April of 2007, and October 2007. (Tr. 267, 281, 294). Plaintiff also testified that he took Ibuprofen for pain. (Tr. 329). *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) ( lack of strong pain medication was inconsistent with disabling pain); *See Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999) (infrequent use of prescription drugs supports discrediting complaints). After reviewing the entire evidence of record, we find substantial evidence to support the ALJ's determination that plaintiff does not have a disabling ankle impairment.

Although plaintiff testified that he did not seek consistent treatment due to the lack of finances, plaintiff has put forth no evidence to show that he has sought low-cost medical treatment or been denied treatment due to his lack of funds. *Murphy v. Sullivan*, 953 F.3d 383, 386-87 (8th Cir. 1992) (holding that lack of evidence that plaintiff sought low-cost medical treatment from her doctor, clinics, or hospitals does not support plaintiff's contention of financial hardship).

With regard to the testimony of plaintiff's father, the ALJ properly considered his testimony but found it unpersuasive. This determination was within the ALJ's province. *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Plaintiff's subjective complaints are also inconsistent with evidence regarding his daily activities. The record reflects in June of 2004, plaintiff reported he would get up around 7:30 in the morning and take classes for his GED until noon. (Tr. 65). Plaintiff reported he would then spend the rest of his day helping his grandfather. At that time, plaintiff reported he took care of his pets and performed some household chores, including doing laundry, cleaning and mowing. (Tr. 67). Plaintiff listed his hobbies as spending time with his grandparents, swimming and fishing and indicated that his impairments did no change his activities. (Tr. 69). In April of 2005, plaintiff reported he was able to go to work, hunt, fish and hang out and play pool with friends. (Tr. 92, 96). In May of 2007, plaintiff reports he was able to watch television, talk on the phone, groom himself, play cards/games, visit relatives and friends, talk to neighbors and exercise daily; to wash dishes, vacuum, do laundry, make his bed, fix things, sleep, go out to eat or to the movies and do other activities weekly; and to clean house, do yard work, shop for groceries, pay bills/handle finances, read, participate in organizations and fish monthly. (Tr. 145). In October of 2007, plaintiff reported he worked one to two days a week doing farm work, including brush hogging, for his grandfather. (Tr. 295). While the record shows plaintiff does have some limitations with activities of daily living, the limitations supported by the record are not as extreme as alleged by plaintiff. *See Hutton v. Apfel*, 175 F.3d 651, 654-655 (8th Cir. 1999) (holding ALJ's rejection of claimant's application supported by substantial evidence where daily

-27-

activities– making breakfast, washing dishes and clothes, visiting friends, watching television and driving-were inconsistent with claim of total disability).

Therefore, although it is clear that plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning his daily activities support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

**C.     RFC Assessment:**

We next turn to the ALJ's assessment of plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his or his limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v.*

-28-

*Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  *Id*.

In finding plaintiff able to perform sedentary work with limitations,  the ALJ considered plaintiff's subjective complaints, the medical records of his treating physicians, and the evaluations of non-examining medical examiners. Plaintiff contends the ALJ improperly disregarded Dr. Smith's opinion and replaced it with his own opinion of plaintiff's abilities.  We disagree.  The ALJ clearly recites the evidence of record and states why he gave more weight to the findings of Dr. Bunting over that of Dr. Smith. We point out it is the ALJ's function to resolve conflicts among the various treating and examining physicians. *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir.2002) (internal quotation marks omitted).

Plaintiff contends Dr. Bunting opines plaintiff is only able to work part-time for short periods of time.  A review of the record shows Dr. Bunting indicated plaintiff was presently doing farm work for his grandfather one to two days a week.  When saying plaintiff was able to perform work for short periods of time, Dr. Bunting is clearly discussing plaintiff's ability to perform farm work.  The record shows Dr. Bunting also completed a medical source statement that the ALJ relied upon when determining plaintiff's RFC.

Regarding plaintiff's physical limitations, the ALJ recited the medical evidence of record and also set forth the findings of Dr. Valera when determining plaintiff's RFC.

Plaintiff also alleges the ALJ failed to adequately address plaintiff's obesity.   In addressing plaintiff's obesity the ALJ states "...the medical records certainly bear out the fact that the claimant's obesity limits his physical activity and is a contributing factor to his medical condition." (Tr. 18).  The ALJ clearly discusses plaintiff's obesity when determining plaintiff's

-29-

RFC. Based on our above discussion of the medical evidence and plaintiff's daily activities, we believe substantial evidence supports the ALJ's RFC assessment.

### D.    Hypothetical Proposed to Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, we find that the hypothetical the ALJ proposed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. *See Goff v. Barnhart,* 421 F.3d 785, 794 (8th Cir. 2005). We point out the ALJ clearly acknowledged plaintiff's level of functioning when he limited plaintiff to unskilled work. *Hillier v. Social Sec. Admin.*, 486 F.3d 359, 365-366 (8th Cir. 2007) (by limiting claimant to simple, concrete work, the ALJ captured the practical consequences of claimant's low average to borderline intellectual functioning). Accordingly, we find that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that plaintiff's impairments do not preclude him from performing other work as a small production machine operator, a small products assembler and a food order clerk. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### E.    Fully and Fairly Develop the Record:

We reject plaintiff's contention that the ALJ failed to fully and fairly develop the record. While an ALJ is required to develop the record fully and fairly even when a claimant has an attorney, *See Freeman v. Apfel,* 208 F.3d 687, 692 (8th Cir.2000) (ALJ only must order consultative examination when it is necessary for an informed decision), the record before the ALJ contained the evidence required to make a full and informed decision regarding plaintiff's

-30-

capabilities during the relevant time period. *See Strongson v. Barnhart,* 361 F.3d 1066, 1071-72 (8th Cir.2004) (ALJ must develop record fully and fairly to ensure it includes evidence from treating physician, or at least examining physician, addressing impairments at issue).

**IV.**     **Conclusion:**

Based on the foregoing, we recommend affirming the ALJ's decision, and dismissing plaintiff's case with prejudice. **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 29th day of July, 2009.

/s/     *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)